Chloe Tindel FOSTER et al., Appellants,

v.

Donnie CUMBIE et al., Appellees.

No. 15353.

Court of Civil Appeals of Texas.

Dallas.

May 30, 1958.

Rehearing Denied June 27, 1958.

Holland & Moore, Athens, and E. E. Cornelius, Jr., Tyler, for appellants.

Justice, Justice & Kugle, Athens, for appellees.

DIXON, Chief Justice.

Our opinion heretofore delivered in this case is withdrawn and in substitution therefor this opinion is delivered.

This is a partition suit. However the main controversy centers around that part of the cause of action which seeks to cancel a warranty deed conveying 200 acres of land in Henderson County, Texas to appellant, Chloe Tindel Foster, and her now deceased husband, Ray Foster. Appellees contend that the 200 acres of land should be included in the property to be partitioned.

The parties to the suit, plaintiffs and defendants, are either children or grandchildren of John B. Tindel, deceased. John B. Tindel died in Henderson County in 1940. Surviving him were his wife, Minnie Tindel, and nine children.

John Tindel had been married twice. His first wife was Bettie Harris Tindel. One child was born of their marriage: Carrie Tindel, now Mrs. Cumbie, a widow. Bettie Harris Tindel died many years ago. At the time of her death the couple had acquired ownership of 100 acres of land, which is part of the land sought to be partitioned in this suit.

About the year 1886 John Tindel married a second time, his wife being Minnie Vessel Tindel. Eight children were born of this second marriage: Paul Tindel, now deceased; Donnie Tindel Cumbie, now the wife of Edd Cumbie; Wade Tindel, now deceased; Jewell Tindel Harrison, a widow; W. C. (Buck) Tindel; Bess Tindel Wells, wife of C. A. Wells; Eliza Jack Tindel Ingram, a widow; and Chloe Tindel Foster, widow of Ray Foster. There are also numerous grandchildren.

John Tindel left a will which was duly probated in 1940. We quote the material part:

"I wish all my property to remain in possession of my wife as long as she lives. Then be divided equally among all my children at her death. She is to serve as survivor and handle all the property without bond, the balance of her life."

After the death of John Tindel, his surviving widow, Minnie Tindel took charge of the estate. On July 14, 1954 she deeded to her daughter Chloe Tindel Foster and her daughter's husband, Ray Foster, the 200 acres of land in controversy. The grantees in this deed did not record the deed until August 27, 1955, which was after the death of the grantor, Minnie Tindel.

Minnie Tindel died intestate May 21, 1955, at the age of 87 years. At the time of her death the community property of the estate included about 659 acres of land if the 200 acres of land deeded to Chloe and Ray Foster are considered as still part of the estate. It is the deed to the 200 acres which was cancelled by the judgment from which this appeal was taken.

Minnie Tindel enjoyed good health all her life until two or three years before her death. Then she was hospitalized for pneumonia, uremic poisoning and lastly for a broken hip sustained in a fall. This mishap left her crippled until her death. She was never able to get about after she broke her hip, but she was able to sit up in a chair. The testimony is that she was a strong willed person all her life, even after she was crippled from her broken hip.

Ray Foster, husband of Chloe Tindel Foster, died in 1955 sometime after the death of Minnie Tindel.

■ Prior to June 1956 this suit was filed. After the death of Minnie Tindel but before the trial of this cause Bess Tindel Wells, Jewell Tindel Harrison, Eliza Jack Tindel Ingram, and Carrie Tindel Cumbie conveyed their interest in the estate to near relatives—daughter, niece, daughter and son—as gifts. Each of the grantors frankly testified that she made the conveyance so as to be eligible to testify notwithstanding Art. 3716 Vernon's Ann.Civ.St., the "Dead Man's Statute." Each of them did subsequently testify in behalf of appellees. However, the testimony on cross-examination of Carrie Tindel Cumbie plainly showed that she still claimed her interest in the estate, so the trial court instructed the jury not to consider her testimony.

At the trial only two special issues were submitted to the jury. In substance they inquired (1) whether the execution of the instrument dated July 14, 1954, and purporting to be a deed from Minnie Tindel to Chloe Foster and Ray Foster, was procured through undue influence exerted upon Minnie Tindel by Chloe Foster and Ray Foster, or either of them; and (2) whether said instrument was delivered to Chloe Foster and Ray Foster by Minnie Tindel. The jury answered the first question "yes", and the second question "no". On February 8, 1957 the Court rendered judgment cancelling the deed in question, and partitioning the property, including the 200 acres in controversy.

Chloe Foster has appealed. She briefs three points on appeal. She says that (1) the evidence was insufficient to support appellees' claim of undue influence; (2) the evidence was insufficient to support appellees' claim of non-delivery of the deed in question; and (3) she was prejudiced by the action of the court in sustaining an unwritten and unrequested exception to her pleadings while her pleadings were being read to the jury.

Some of the facts are undisputed. Chloe Tindel Foster and Ray Foster were married in 1932. Within a few months it was discovered that Chloe Foster was afflicted with tuberculosis of the lungs. She spent several months in a hospital. After leaving the hospital she and her husband came to live with her parents, John and Minnie Tindel. For about seven years thereafter Chloe Foster was bedridden. Ray Foster, her husband, worked on the farm. After the death of John Tindel in 1940, Chloe and Ray Foster continued to live on the farm, Ray working and acting as manager of the farm for Minnie Tindel. All witnesses agreed that he was a good worker. The farm made a profit. The testimony contains no criticism of Ray Foster as a farm worker, or farm manager. Eliza Ingram and her daughter had also lived on the farm, but in 1943 they moved to Fort Worth, Texas. They now live in California. After the death of Ray Foster in 1955, Chloe Foster continued to live on the farm.

It is also undisputed that Minnie Tindel executed the deed in question. It was executed in the presence of Dennis Sholars and his wife, Clara Sholars, neighbors, who signed as witnesses. And it was acknowledged in the presence of E. E. Cornelius, Jr., notary public and attorney, who had prepared the deed. The acknowledgment is in the statutory form.

■■ In our opinion the evidence is not sufficient to support the jury finding that

the execution of the deed was procured through undue influence exerted upon Minnie Tindel by Chloe Foster and Ray Foster, or either of them. Most if not all of the testimony on this point was hearsay testimony by witnesses who testified to statements made to them by Minnie Tindel. Much of this testimony refers to alleged declarations of Minnie Tindel as far back as 1942, 1943 and 1945, and in addition to being hearsay, is too remote to be considered.

The record is much too voluminous for us to quote all the testimony of this type, but we shall present four samples of it. Mrs. Bess Tindel Wells testified as follows:

"Q. Now, you have previously testified that your mother visited you in your home and that you had visited her in her home. On those instances, did you ever have any conversations with your Mother? A. Yes.

"Q. Did you ever have any conversation with her relative to the defendant in this case? A. Yes.

"Q. I am referring to Chloe Foster. What, if anything, did she say to you concerning Chloe Foster's treatment of her?

"Mr. Moore: We object to the question, Your Honor, in that it calls for a conversation with a deceased person, and it's clearly hearsay, since it is an oral statement made for the purpose of proving the true statement therein.

"Mr. Justice: If the Court please, as we make this proof for the purpose of showing the state of mind of the Declarant at the time they were made.

"By the Court: Overrule the objection, to which you may have your exceptions.

"Mr. Moore: Note our exceptions.

"By the Court: Answer the question, if you haven't answered it. * * * A. Yes.

"By the Court: Your objections go to that question and answer.

"Mr. Justice:

"Q. When was the first of these conversations? A. It has been quite sometime ago, a number of years ago.

"Q. Do you have an idea about when it was, the first of them, I'm speaking of. A. The first of them was after I moved to Fort Worth.

"Q. What year was it that you moved to Fort Worth? A. In 1942. * * *

"Q. Now, specifically, did she ever talk to you about Chloe's urging her to make a deed to the property? A. Yes. * * *

"Q. What was it that she told you? A. She said that Chloe was trying to force her to make her a deed to the property.

"Q. Did she say how she was trying to force her? A. Yes. * * *

"Q. As best you recall, what was it that she said to you about what means Chloe had employed to try to get her to sign that deed? A. She said she had threatened to leave her and that she would leave, if she didn't make her a deed to this property. * * *

"Q. All right. Will you please tell the jury what your mother said to you on that occasion.

"Mr. Cornelius: To which we object, Your Honor.

"By the Court: Overrule the objection. The same objections and the same exceptions to the answer to this question. Answer the question Mrs. Wells, what she said. A. She said that Chloe had threatened to leave her unless she made her a deed to the property.

"Q. Did she say anything to you about what means Chloe was employing to try to get her to sign the deed?

"Mr. Moore: We object to that, Your Honor.

"By the Court: Answer that question yes or no. A. Yes.

"Q. What was it that she said? A. She said she was treating her cruelly.

"Q. Did you ask her what the cruel treatment consisted of? A. She said she bemeaned her. * * *

"Q. I would like to go into this a little bit on the question of duress. Now, you said that in 1944, I believe, that Mrs. Tindel informed you that Chloe Foster was attempting to get her to deed her a portion of the property, threatening to leave, if she didn't, is that correct? A. That's right.

"Q. And Mrs. Tindel stated that she did not intend to do it, is that right? A. She did.

"Q. That is in 1944? A. Somewhere thereabout. I wouldn't say exactly."

Mrs. Jewell Harrison testified as follows:

"Q. You say the first conversation you had concerning this land was about two years after Mr. Tindel's death? A. Yes, I would think so.

"Q. Where was this conversation? A. In her home, mother's home.

"Q. Did she bring up the discussion on this land herself? A. Yes.

"Q. On this occasion, what did she say concerning this land?

"Mr. Moore: Note our objection, if the Court please, to any conversation that she might relate would be hearsay.

"By the Court: Overrule that objection.

"Mr. Moore: Note our exceptions.

"Q. Tell the jury what Mrs. Tindel said on this occasion. * * * A. She said, my mother said that Chloe and Ray Foster were trying to make her deed them some of the land, and mother said that she would never do it as long as she lived. * * *

"Q. Did you frequently visit your mother after you stayed with her in '53, up until the time she died? A. Yes.

"Q. Did she ever mention this property after August of '53, to you? A. No, I don't believe, let me see, I don't think so."

Mrs. Eliza Jack Ingram testified as follows:

"Q. When was the last conversation you had with her about this deed? A. Well, it was before my mother took sick.

"Q. What did she say at that time? A. She said that, 'Eliza Jack, they hound me all the time about deeding them some of this place.' "

Mrs. Lelia Porter testified as follows:

"Q. Did you know Mrs. Minnie Tindel during her life time? A. Oh, yes.

"Q. Did you visit with her in August or September of 1954? A. Oh, yes.

"Q. Well, while you were in the home there with Mrs. Tindel, did she ever discuss with you about a deed that she had made or was going to make to Ray Foster and Chloe Foster? A. Yes.

"Q. What did she say about the deed?

"Mr. Moore: Note our exceptions, if the Court please.

"By the Court: State your exceptions.

"Mr. Moore: All right, Sir, it would be hearsay.

"By the Court: Overrule the objection.

"Mr. Moore: And it is not proper rebuttal testimony.

"By the Court: Overrule the objection.

"Mr. Moore: We except, if the Court please, on both counts.

"Q. What did she say to you about a deed? A. She said she had signed a paper for a deed, but it was no good unless her children, her heirs signed it and that she knew it; the man told her it was no good unless they signed it."

Appellant offered witnesses in rebuttal who testified that Minnie Tindel had made no such declarations to them. Before closing appellees produced further testimony from other witnesses who also gave hearsay testimony as to declarations of Minnie Tindel.

■ The law applicable to situations of this kind has been laid down by our Supreme Court in Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1142: *"Where undue influence,* as distinct from mental incapacity, is the issue, and *is independently proved,* declarations of the testator expressive of a mental state produced by such influence, whether made contemporaneously with the execution of the will or within a reasonable time before or after its execution, are admissible as an aid in the determination of the question of his free agency in making the will. * * * The testator's declaration, testified to by this witness, that 'Mrs. Scott had been after him to make a will' was clearly inadmissible. It was but a naked statement of fact, a plain narration of a past occurrence, which Scott's declarations were wholly incompetent to prove. * * *" Then the Court holds: "the law emphatically says a testator's declarations cannot be used, as upon such issue they are purely hearsay." (Emphasis ours.)

We also quote from Hulme v. Jaschke, Tex.Civ.App., 168 S.W.2d 326 and 328. "The court properly excluded all testimony with reference to declarations made by the testator tending to show that he was unduly influenced to execute the will. Such undue influence cannot be established by such declarations, and they are not even admissible in evidence, unless and until undue influence has been at least prima facielly established by other evidence." See also Bledsoe v. Short, Tex.Civ.App., 264 S.W. 2d 445; Naihaus v. Feigon, Tex.Civ.App., 244 S.W.2d 325; Thornburg v. Manskey, Tex.Civ.App., 219 S.W.2d 720; Bethel v. Yearwood, Tex.Civ.App., 142 S.W.2d 927; 94 C.J.S. Wills § 247, p. 1112.

■ Appellees say that the circumstances shown by the record are sufficient to show undue influence independently of the declarations of Minnie Tindel. These circumstances are listed as follows: (1) Only Chloe Foster and her husband lived in the house with Minnie Tindel for several years prior to her death; (2) during the last two years of her life Minnie Tindel was ill and infirm and compelled to rely on Chloe Foster to take care of her; (3) she was in an emotional state prior to the execution of the deed and evidenced hostility toward Chloe Foster; (4) Chloe and Ray Foster did not record the deed until August 27, 1955, which was after grantor's death; (5) the deed made an unnatural distribution of grantor's property; and (6) Ray Foster paid for the preparation of the deed.

We are unable to agree with appellees. The only evidence we find in the record of hostility on the part of Minnie Tindel toward the grantees was the hearsay testimony of declarations of Minnie Tindel. Nor do we believe the other circumstances relied on by appellees are sufficient of themselves to support a finding of undue influence. There is testimony in behalf of appellant that appellant and her mother were on the best of terms.

■ In a case in which the facts are similar in several respects to the facts in this case our Supreme Court passed on the question whether the circumstances con-

·stituted evidence of undue influence. In that case as in this case, a parent advanced in years, who had sustained a broken hip, made a deed to one of his children. In that case as in this, the grantee had made arrangements with a notary and witnesses, and had paid an attorney to prepare the deed. In that case statements were made by the grantor, as it is alleged statements were made by the grantor in this case, in derogation of the deed. Also it is contended in that case as it is contended in this case that the deed made an unnatural disposition of the grantor's property. But the Supreme Court held that under all the facts shown in the record there was no unnatural disposition of grantor's property, and that the circumstances constituted no evidence of undue influence. Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208. It has also been held that evidence of an opportunity to exert undue influence is not sufficient to establish that undue influence was actually exerted. Bethel v. Yearwood, Tex.Civ.App., 142 S.W.2d 927 (Syl. 6).

■ Since we are of the opinion that there was not sufficient other independent evidence to show undue influence, we must hold that the testimony of declarations made by Minnie Tindel was hearsay testimony and not admissible. We therefore find that there was insufficient evidence to support appellee's claim of undue influence. Appellant's point of Error No. 1, will be sustained as to the insufficiency of the evidence to show undue influence.

■ We are also of the opinion that there was insufficient evidence to support the jury's finding that the deed in question was not delivered by the grantor Minnie Tindel to grantees Chloe Foster and Ray Foster.

It is undisputed that Ray Foster had the deed in his possession a few days after its execution. Ivy Fulgham, President of the First State Bank at Brownsboro, Texas, where both Minnie Tindel and Ray Foster did business, testified that Ray Foster came to the Bank with the deed, showed it to Fulgham and Fulgham read the deed. It seemed to him all right. Dennis Sholars testified that he went to the office of E. E. Cornelius, Jr., with Ray Foster, who had the executed deed in his possession at the time. E. E. Cornelius, Jr., also testified that Sholars and Ray Foster came to his office and that Foster showed him the executed deed, and he Cornelius, advised Foster to have it recorded.

■ Our Supreme Court has held that possession of a deed by the grantee raises a presumption that the deed was delivered to the grantee by the grantor. We quote: "If a deed duly executed be found in the possession of the grantee, the delivery by the grantor and acceptance by the grantee will be presumed * * *". Gonzales v. Adoue, 94 Tex. 120, 58 S.W. 951, 953. See also Rabb v. Rabb, Tex.Civ.App., 108 S.W. 2d 440; and 14–B Tex.Jur. 557.

■ It is further undisputed that the deed here in question bore an acknowledgment in statutory form made by Minnie Tindel before E. E. Cornelius, Jr., a notary public and attorney. It has been held that in the absence of evidence to the contrary such an acknowledgment is a factor from which, with other circumstances, a finding of delivery may be made. Keith Lumber Co. v. Houston Oil Co., 5 Cir., 257 F. 1; Dunn v. Heasley, 375 Ill. 43, 30 N.E.2d 628; Sweeney v. Sweeney, 126 Conn. 391, 11 A. 2d 806; Dempsey v. Allen, 210 Minn. 395, 298 N.W. 570; Wilmarth v. Hill, 55 S.D. 410, 226 N.W. 557.

What evidence is there in the record showing non-delivery of the deed? We have read the record carefully and we have found little or no evidence of non-delivery—certainly not sufficient evidence to overcome the presumption of delivery which our Supreme Court says is raised by the fact that the deed after its execution was in the possession of the grantee. So far as we can determine from appellee's brief, appellees rely on the fact that there is no testimony from any witness who actually saw Minnie Tindel physically hand

the deed to Chloe Foster, or Ray Foster, and the further fact that the deed was not recorded until after the grantor's death. Appellees have not cited any authority, and we have found none, holding that the foregoing facts, standing alone, are sufficient to support a finding of non-delivery of a deed, especially in the face of undisputed facts raising a presumption of delivery.

There is in the record testimony admitted over the objection of appellant, of Mark Cumbie, grandson of Minnie Tindel, that his grandmother told him that the other children did not want to sign the deed, so she hoped everyone would forget it. Such evidence was hearsay, was not admissible, and cannot be given any weight on the issue of delivery. Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, 537, 538; Phillips v. Anderson, Tex.Civ. App., 93 S.W.2d 171, 176; Kincheloe v. Kincheloe, Tex.Civ.App., 152 S.W.2d 851, 855. We sustain appellant's Point of Error No. 2 as to the insufficiency of the evidence to show non-delivery of the deed.

Appellant's Point of Error No. 3 raises a question which will not likely occur in another trial of this case, so we see no necessity to pass on it here.

Appellants have prayed that we reverse the trial court's judgment and render judgment for appellant; or in the alternative we reverse the judgment and remand the cause for another trial.

The trial court can direct a verdict and this court can render judgment on appeal only when there is no evidence to support the judgment. If there is merely an insufficiency of evidence to support the judgment the trial court can do no more than grant a new trial, and we can do no more than remand the case for another trial. In our concurring opinion in Wood v. American Security Life Ins. Co., Tex. Civ.App., 304 S.W.2d 559, 564, we discussed this subject and cited authorities.

Because of the insufficiency of the evidence, the judgment is reversed and the cause remanded for another trial.