

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRUCE WHEATLEY, in his capacity as Executor of the Estate of Judith T. Wheatley, | § § § | No. 08-18-00106-CV |
| Appellant/Cross-Appellee, | § | Appeal from the |
| v. | § | Probate Court No. 1 |
| DALE FARLEY, in his capacity as Dependent Administrator of the Estate of Travis B. Kirchner, | § § | of El Paso County, Texas (TC# 2014-CPR01539) |
| Appellee/Cross-Appellant. | | |

**O P I N I O N**

Appellant/cross-appellee Bruce Wheatley, as Executor of the Estate of Judith T. Wheatley ("Wheatley"), appeals from that portion of a judgment, rendered upon a directed verdict, declaring six warranty deeds null and void. Appellee/cross-appellant Dale Farley, as Dependent Administrator of the Estate of Travis B. Kirchner ("Farley"), appeals from that portion of the same judgment, rendered upon a jury verdict, awarding damages to Wheatley in the sum of $500,000. We reverse and remand.

**BACKGROUND**

**A. Introduction**

This appeal concerns six parcels of property on which Travis Kirchner ran a business boarding horses and hosting entertainment events. Collectively, the parcels of property were referred to interchangeably as either the Poki Roni Ranch or the Poki Roni Farm. Together, all six parcels total 10.31 acres of land, situated with three houses and horse stables. Relevant to this suit, it is undisputed that Travis owned the Poki Roni property at least until November 30, 2011, which is the date on which he executed six warranty deeds (the "Deeds"), as grantor, which purportedly conveyed the Poki Roni property to grantee Judith ("Judy") Wheatley, his very close friend.

In May 2014, Travis died in prison, where he was serving a sentence for murdering his mother. *See Kirchner v. State*, No. 08-11-00368-CR, 2014 WL 2090032, at *2 (Tex. App.—El Paso May 16, 2014, no pet.) (not designated for publication). Judy died over a year later, in August 2015. The Deeds at issue here were not recorded until June 26, 2017, once they were discovered among other personal belongings of Judy's removed from her residence on the Poki Roni property.

By this case, the representatives of Travis's and Judy's respective estates are disputing the ownership of the Poki Roni property after the execution of the Deeds. The issues being contested include a question of whether the Deeds, which were executed in November 2011, were ever delivered to Judy such as to effectuate a conveyance of ownership. And, under the circumstances, whether Judy's estate was owed damages for the reasonable value of work she performed for Travis for the period he was incarcerated to the date an administrator was appointed for his estate.

## B. Judy's relationship with Travis

Travis and Judy became close friends who loved and cared a great deal for each other. Until his incarceration in late 2011, Travis lived in a house on the Poki Roni property. In a separate house, his mother also lived on the property before her death. In September 2008, Judy moved into

the house where Travis's mother had formerly lived and continued living there until her own death in August 2015.

When Travis was released on bail, Judy became his rock and he depended on her to do things on the property. Later, when he was in prison, Travis spoke a great deal to her by phone and also wrote several letters expressing his love and affection for her and his desire to take care of her. Travis referred to Judy as his wife, and to her daughters as his daughters or stepdaughters. He also informed the Texas Department of Corrections that Judy was his wife. However, Farley, who was a friend of both Travis and Judy before becoming the dependent administrator of Travis's estate, testified that Travis explained to him that he thought it would be easier for him in prison, being that he was a homosexual, if he said Judy was his common-law wife. In addition, Farley testified that Travis had repeated this explanation in a codicil to a 2014 holographic will where he clarified that his relationship with Judy was purely platonic.

There is no dispute that Judy handled Travis's affairs while he was in prison and spent long hours working on the Poki Roni property. Farley testified that she deserved to be compensated for all her work. After Judy's death, Farley explained he had paid a person $32,000 per year just to care for the horses at Poki Roni. But he also noted that Judy did not pay any rent while she lived at Poki Roni, nor did she pay to board her three horses and two ponies. Farley stated that she paid in work rather than in fees.

### C. Travis's debts

In February 2013, Farley testified he had obtained loans for Travis on two properties he owned in New Mexico. Farley testified that Travis told him he had obtained the loans to raise money to pay his appellate lawyers. Farley also described that Travis had obtained a loan from

someone named Ceballos. That loan agreement which was entered in the record, was personally guaranteed by Judy. Farley testified that Travis had acknowledged—in a codicil to his 2014 holographic will—that he owed a $150,000 debt for legal expenses. Farley also described that Travis owed $140,000 on the two properties he had mortgaged in New Mexico.

### D. Negotiations concerning Poki Roni

In August 2011, Travis signed a listing agreement with a realtor to sell the Poki Roni property. By its terms, the agreement expired at the end of December 2011. During his murder trial in the fall of 2011, and continuing after his conviction, Travis, through attorney Stephanie Townsend Allala, engaged in negotiations to sell Poki Roni to David Bingham. Nonetheless, the sale was never completed.

### E. Deeds to Judy

On November 30, 2011, a month prior to the expiration of the listing agreement, Travis executed six warranty Deeds conveying the Poki Roni property to Judy. Allala, whose firm prepared the Deeds, took them to Travis in prison, where he signed the documents and she notarized his signature. Each Deed states on its face that it is to be returned to Judy after recording. The Deeds were not recorded in the El Paso County Clerk's Office until June 26, 2017, after both Travis's and Judy's deaths.

Jessica Kludt, Allala's daughter,[1] testified that she drafted the Deeds and they were taken back to the Allala law office after they were signed. She further testified that she did not know, however, whether the Deeds were ever delivered to Judy, but she had assumed they were because the originals were not in their office file and "[t]here's nobody else that we would have released

---

[1] At the time she drafted the Deeds, Kludt had graduated from law school and was awaiting her bar exam results.

them to." She confirmed that the office followed a standard policy of delivering original documents to whomever they were supposed to go to. She also acknowledged, though, that her mother would have had visitation rights with Travis, and the Deeds also could have been delivered to him while he remained in prison. Kludt testified that, while the firm had a policy of delivering original deeds to the party who is meant to receive them, she checked her office records and they did not indicate one way or the other to whom the documents were given. Kludt also noted that it was highly unusual that the Deeds were not filed.

Farley testified he personally knew nothing about the Deeds until they were filed. Specifically, he claimed he did not know whether Judy received them or not or whether the Deeds were ever delivered to Judy. In fact, he was not aware of their existence until they were recorded in 2017. Instead, he testified that after Judy's death, the Deeds had been discovered among her personal property in the Poki Roni house where she had been living. Farley testified that one could assume from this circumstance that the Deeds were delivered to Judy, but one could also assume that they were delivered to Travis's house and were moved by Judy. Farley explained that Judy rented out Travis's house after he was incarcerated, and when she did, she took his personal belongings to the house where she was living. Travis's and Judy's personal property thus became intermingled.

Farley concluded that it was "logical that [Judy] ended up with the deeds somehow," but how they got there was "pure speculation."

**F. Travis's wills**

On November 1, 2011, Travis signed a durable power of attorney giving Judy the authority to handle his real and personal property. On that same date, he executed a will leaving everything

to Judy and, if she predeceased him, to her two daughters. The will that was admitted to probate, though, was a holographic will executed by Travis in February 2014, while he was in prison.[2] In that will, Travis left his property to two individuals, Mr. Florey and Celso Macias. The holographic will included an inventory which listed the addresses of the three Poki Roni houses and the ten acres of the Poki Roni Ranch. The only provision this will set forth for Judy was for her to receive all the animals and all the saddles, the tack, and blankets.

### G. The lawsuit

Wheatley filed suit against Farley, asserting a claim that Travis defrauded Judy, a quantum meruit claim for the value of services Judy rendered to Travis, and requests for declarations concerning Judy's status as Travis's common-law wife and the validity of the holographic will. Wheatley twice amended or supplemented his petition to assert a variety of other claims. Of consequence to this appeal is Wheatley's claim, in his live petition at the time of trial, for damages to repair the Poki Roni property and for recovery of rents received by Travis's estate from that property. The basis of this claim is the assertion that Poki Roni was not part of Travis's estate, but had been conveyed to Judy through the six Deeds. Farley filed a counterclaim in which he asserted Travis's estate's ownership of Poki Roni by a suit to quiet title and trespass to try title.

At a pre-trial hearing, the parties admitted into evidence multiple exhibits to include the Deeds at issue, multiple letters exchanged between Travis and Judy, property and financial records, Travis's Last Will dated 2011, and the durable power of attorney dated 2011 in which Travis appointed Judy as his attorney-in-fact without restrictions. Wheatley called only Dale Farley and

---

[2] Although Farley testified about the holographic will and inventory, neither document was admitted nor made a part of our record.

Jessica Kludt to testify at trial. At the conclusion of their testimony, Wheatley rested his case. Farley also rested and moved for a directed verdict on the issue of delivery, which the trial court granted. The only issue submitted to the jury was the reasonable value of the work Judy performed for Travis between the date of his incarceration and the date Farley was appointed dependent administrator of his estate. The jury found that value to be $500,000.

The court entered judgment declaring the Deeds null and void, and awarding Wheatley the sum of $500,000, plus pre- and post-judgment interest. Farley filed a motion seeking a judgment notwithstanding the verdict or, in the alternative, a new trial on damages. Both parties appealed.

## DISCUSSION

In two related issues, Wheatley asserts that the trial court erred by granting a directed verdict on the issue of whether the six warranty Deeds were delivered, and by failing to submit the issue of delivery to the jury. Farley raises one cross-issue, asserting that the evidence is legally and factually insufficient to support the jury's finding that $500,000 is the reasonable value of the work Judy performed for Travis while he was incarcerated.

### A. Standards of Review

"A trial court properly enters a directed verdict (1) when a defect in the opposing party's pleadings makes them insufficient to support a judgment; (2) when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) when the evidence offered on a cause of action is insufficient to raise an issue of fact." *Alanis v. US Bank Nat'l Ass'n*, 489 S.W.3d 485, 503 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A directed verdict is reviewed under the legal sufficiency standard of review. *Rojas v. Duarte*, 393 S.W.3d 837, 840 (Tex. App.—El Paso 2012, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.

7

2005).

The ultimate test for legal sufficiency is whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. Thus, the reviewing court must "consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. It "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827.

A legal sufficiency challenge will be sustained only if (1) there is a complete absence of evidence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. "[M]ore than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotation marks omitted).

An appellate court reviewing the factual sufficiency of the evidence "must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

### B. Delivery of the Deeds

"Conveyance by deed requires delivery of the deed." *Hernandez v. Hernandez*, 547 S.W.3d 898, 901 (Tex. App.—El Paso 2018, pet. denied) (citing TEX. PROP. CODE ANN. § 5.021); *accord Noell v. Crow-Billingsley Air Park Ltd. P'ship*, 233 S.W.3d 408, 415 (Tex. App.—Dallas 2007,

pet. denied). Delivery encompasses two elements: "(1) the grantor must place the deed within the control of the grantee (2) with the intention that the instrument become operative as a conveyance." *Hernandez*, 547 S.W.3d at 901; *accord Noell*, 233 S.W.3d at 415.

Manual delivery of the deed is not, however, required. *Noell*, 233 S.W.3d at 415. The test is not physical possession, but whether the grantor gave the grantee control of the deed. *Id.* at 416. For example, a grantor may effect a delivery through a third person: "If a grantor delivers a deed to a third person, without any reservation on his part of the right to recall it, and with instructions to the third person to deliver it to the grantee upon the grantor's death, he thereby makes an effective delivery of the deed as a matter of law." *Ragland v. Kelner*, 148 Tex. 132, 135, 221 S.W.2d 357, 359 (1949).

Ultimately, "[t]he question of delivery of the deed is controlled by the intent of the grantor, and it is determined by examining all the facts and circumstances preceding, attending, and following the execution of the instrument." *Hernandez*, 547 S.W.3d at 901; *accord Noell*, 233 S.W.3d at 415.

Only two witnesses testified at trial, and neither could say whether the Deeds were delivered to Judy; both testified that they simply did not know. Farley admitted, though, that the Deeds were found among Judy's possessions after her death. The supreme court has held that, "[i]f a deed duly executed be found in the possession of the grantee, the delivery by the grantor and acceptance by the grantee will be presumed, subject, however, to be disputed." *Gonzales v. Adoue*, 94 Tex. 120, 126, 58 S.W. 951, 953 (1900); *see Bell v. Smith*, 532 S.W.2d 680, 685 (Tex. App.—Fort Worth 1976, no writ); *Fox v. Lewis*, 344 S.W.2d 731, 741 (Tex. App.—Austin 1961, writ ref'd n.r.e.). Thus, the fact that the Deeds were found in Judy's possession among her belongings

9

gives rise to a presumption that they were delivered to her. The question, then, is whether Farley rebutted that presumption. *See Gonzales*, 58 S.W. at 953 (presumption is subject to dispute).

The opinion in *Foster v. Cumbie*, 315 S.W.2d 151 (Tex. App.—Dallas 1958, writ ref'd n.r.e.), is instructive concerning evidence of non-delivery of a deed. The appellees in that case relied on "the fact that there is no testimony from any witness who actually saw [the grantor] physically hand the deed to [the grantee], and the further fact that the deed was not recorded until after the grantor's death." *Id.* at 158-59. The court concluded that those facts, standing alone, were insufficient to support a finding of non-delivery to rebut the presumption of delivery. *Id.* at 159.

As in *Foster*, Farley relies on the fact that there is no testimony from any witness who saw Travis, or anyone else,[3] physically give the Deeds to Judy, and the fact that the Deeds were not recorded until after Travis's death. This evidence, as in *Foster*, is insufficient to rebut the presumption of delivery. *See id.* But Farley also notes that there is evidence that Travis's and Judy's personal property had become intermingled when Judy moved Travis's belongings to the house where she was living. This gives rise to a possibility that the Deeds were in Judy's possession only because her property had become intermingled with Travis's. But that mere possibility is not sufficient to overcome the presumption of delivery, particularly in light of Farley's agreement at trial that the Deeds were found among *Judy's* personal belongings.

Finally, Farley relies on evidence that Travis treated Poki Roni as his own after he executed the Deeds. For example, he engaged in negotiations to sell Poki Roni, and included that property in an inventory of his assets as part of his 2014 holographic will. This evidence may, but does not

---

[3] Because Travis was in prison, any physical delivery of the Deeds to Judy would have been accomplished through a third person.

necessarily, support an inference that he did not place those Deeds within Judy's control with the intent that they operate as a conveyance. The relevant time to gauge Travis's intent is the time the Deeds were placed within Judy's control. *See Ragland*, 221 S.W.2d at 359 (intent is measured at "the very time" of delivery). But the record in this case does not reveal when the Deeds were placed within Judy's control. As a consequence, it does not identify "the very time" that Travis's intent must be assessed. *See id.*

The lack of evidence concerning when and how the Deeds came to be in Judy's control might, at first blush, appear to leave the issue of delivery (and the subsidiary issue of Travis's intent) unresolvable. However, we reiterate that the fact that the Deeds were found in Judy's possession at the time of her death gives rise to a presumption that they were delivered to her. *See Gonzales*, 58 S.W. at 953. And, because delivery of a deed requires an intent that the deed operate as a conveyance, the presumption of delivery includes a presumption that Travis intended, at the time the Deeds were placed within Judy's control, that they operate as a conveyance of Poki Roni to her. *See Noell*, 233 S.W.3d at 415; *Hernandez*, 547 S.W.3d at 901. We conclude that the evidence of non-delivery is not sufficient to overcome the presumption of delivery. It does, however, raise an issue of fact concerning Travis's intent in placing the Deeds within Judy's control.

The evidence is such that reasonable and fair-minded people could differ in their conclusions on the issue of delivery. *See City of Keller*, 168 S.W.3d at 827; *Ridgway*, 135 S.W.3d at 601. The trial court therefore erred by granting a directed verdict on that issue.

Accordingly, Wheatley's first issue is sustained.

**C.  Reasonable value of Judy's services**

11

The sole issue presented to the jury was to determine "the reasonable value of the work performed by Judith Wheatley for Travis B. Kirchner" from the date of his incarceration until the date Farley was appointed dependent administrator of his estate.[4] Farley asserts one cross-issue, stating that the evidence is legally and factually insufficient to support the jury's answer of $500,000. Farley concedes in his brief, though, that there is some evidence of the value of those services, and requests only that he be granted a new trial on this issue.

We agree that the record contains some evidence of the value of Judy's services. Farley testified that, once he was appointed dependent administrator of Travis's estate, he paid someone $32,000 per year to care for the horses boarded at Poki Roni, a task that Judy performed while Travis was incarcerated. We therefore cannot conclude that the evidence is legally insufficient to support the jury's assessment of damages. The question, then, is whether the evidence is factually sufficient to support the jury's $500,000 figure.

Wheatley identifies evidence generally showing a variety of tasks that Judy performed for Travis, but other than the testimony just noted, the record is devoid of any evidence valuing those services. Wheatley points to testimony by Farley that perhaps $100 per hour would be fair compensation, but there is no evidence of the number of hours Judy expended. Rather, Wheatley argues that $100 per hour would yield compensation of $873,600 per year. This, however, assumes that Judy worked 24 hours per day for 364 days of the year.[5] There is certainly no evidence that Judy performed compensable services every hour of every day but one in the year.

---

[4] Wheatley asserts that he did not plead a cause of action for quantum meruit, but that the matter was tried by consent. We note, however, that Wheatley's live pleading specifically alleges that Judy performed services for Travis for which she was not paid, and that Wheatley was seeking recovery for the reasonable value of those services.

[5] 24 x 364 x $100 = $873,600.

Wheatley also argues that the jury could have based its damage figure on amounts Judy paid out of her own funds for Travis's attorney's fees and to guarantee a note on which Travis was obligated, or on the mere fact that Travis identified Judy as his common-law wife.[6] The task before the jury, however, was to determine the reasonable value of the *work performed* by Judy for Travis while he was incarcerated. Whether Judy was Travis's common-law wife or whether she had paid any of his debts with her own funds has no bearing on the value of any work she performed for him.

In a related argument, Wheatley contends that the jury could have determined the amount of damages any number of ways because Farley did not object to the lack of an instruction on how to calculate those damages. Wheatley concludes that Farley waived any complaint concerning the jury's damage finding. But "[t]he measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed and the materials furnished." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018). The jury charge in this case therefore correctly submitted the measure of damages for quantum meruit recovery; no further instructions were required. *See id.*

In any event, the issue before this Court is not jury charge error, but the sufficiency of the evidence to support the jury's answer to the question it was actually asked. We conclude that, while the record contains some evidence to support an award of quantum meruit damages, the evidence is factually insufficient to support the jury's determination that $500,000 is the

---

[6] The record does not contain any evidence that Judy actually paid any amounts on Travis's behalf from her own funds. Farley testified only that perhaps someone paid Travis's legal fees and then was reimbursed. The record also does not contain any evidence that Judy was, in fact, Travis's common-law wife. Specifically, there is no evidence that Judy agreed to be married or that, after any such agreement, she and Travis lived together as husband and wife. *See* TEX. FAM. CODE ANN. § 2.401.

13

reasonable value of the work Judy performed for Travis. *See id.* at 740-41. Farley is therefore entitled to a new trial on the issue of Wheatley's quantum meruit damages. *See id.* at 744.

Accordingly, Farley's cross-issue is sustained.

## CONCLUSION

The judgment is reversed, and the cause is remanded to the trial court for further proceedings.

GINA M. PALAFOX, Justice

August 5, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.
Alley, C.J., dissenting

14